UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| T.J. AHRENS EXCAVATING , INC., | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:10-CV-1313 SNLJ |
| | ) | |
| AMEC CONSTRUCTION MANAGEMENT, INC., f/k/a MORSE DIESEL INT'L, INC. | ) ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Plaintiff T.J. Ahrens Excavating, Inc., has filed this breach of contract action against Defendant AMEC Construction Management, Inc., alleging Defendant breached its contract with Plaintiff arising out of the construction of the Thomas F. Eagleton Federal Courthouse (Courthouse) in St. Louis, Missouri. This matter is before the Court on Defendant's motion to dismiss [9], filed July 26, 2010, which this Court converted to a motion for summary judgment pursuant to Rule 12(d) of the Federal Rules of Civil Procedure on November 7, 2011 [23]. Extensive responsive pleadings have all been filed, and this matter is now ripe for disposition.

**I.      Factual Background**

The following facts are uncontested except where noted. Plaintiff is a Missouri corporation with its principal place of business in St. Louis, Missouri. Defendant is a Delaware corporation with its principal place of business in Oakville, Ontario, Canada. As of February, 2010, Defendant is no longer registered to do business in Missouri.

In 1994, Defendant AMEC Construction Management, Inc.(ACMI), then known as Morse Diesel International, Inc., was the general contractor tasked with completing the Thomas

F. Eagleton Federal Courthouse (the Courthouse) in St. Louis, Missouri. The Courthouse construction was divided into two phases. Contracts to select the general contractor for each phase were competitively bid in separate bidding rounds and Defendant was selected as the general contractor for both Phase I and Phase II of the Eagleton Courthouse construction. On August 1, 1994, Plaintiff and Defendant entered into a contract whereby Plaintiff was to perform demolition, test pit investigation, and earthwork in connection with Phase I of the construction of the Courthouse. On August 20, 1994, Plaintiff and Defendant entered into a second contract, separate and distinct from the August 1, 1994 Phase I contract, whereby Plaintiff was to perform demolition and earthwork in connection with Phase II of the Courthouse construction.

Construction of the Courthouse did not go according to plan. Due to complications encountered in the course of performing its obligations under the contracts, Plaintiff had accrued $1,069,000 in claims against Defendant and the General Services Administration (GSA), the entity that owns the Courthouse. Plaintiff was not the only entity with claims against the Defendant and the GSA, and in an effort to streamline the process of presenting claims to the GSA, Plaintiff entered into a "Standstill Agreement" with Defendant on July 30, 1996, whereby Plaintiff agreed to postpone pursuing any legal action against Defendant in exchange for Defendant's agreement to present Plaintiff's claims arising out of the Courthouse project, consolidated with the claims of several other subcontractors ("the consolidated claims"), to the GSA on Plaintiff's behalf. Plaintiff's Document [13] - Affidavit of D. Lynn Whitt, Exhibit C. Defendant agreed to confer with Plaintiff before reaching any settlement with the GSA concerning Plaintiff's claims, and that any settlement with the GSA reached without consulting Plaintiff would not prejudice Plaintiff's potential recovery against Defendant. The Standstill Agreement also required Defendant to keep Plaintiff apprised of developments concerning

Plaintiff's claims and specifically advise Plaintiff of any resolution of its claims. The Standstill Agreement expressly defines "Project" as Phase I of the Courthouse construction. Whitt Affidavit, Exhibit C.

On August 2, 1996, Defendant presented the consolidated claims of several sub-contractors, including the Plaintiff, to the GSA. The GSA denied the consolidated claims on September 26, 1997. Following this denial, Defendant appealed to the General Services Administration Board of Contract Appeals. Defendant's Exhibit 2. Meanwhile, Defendant entered into a partial settlement (referred to by Defendant as the "P-3 settlement") with the GSA concerning certain Phase I hazardous waste removal issues. On April 30, 1997, Plaintiff and Defendant entered into an agreement whereby Plaintiff agreed to reduce its claims against Defendant, and by extension the GSA, to $782, 626.27 in exchange for a $275,000 payment from proceeds of the P-3 settlement. Defendant's Document [10] - Exhibit 3.

In 1999, the GSA began raising a series of counterclaims against Defendant alleging fraud and other improper conduct, which ultimately led to criminal charges. In June, 1999, the GSA terminated Defendant as general contractor for Phase II of the Courthouse project. Shortly thereafter, Plaintiff filed a lawsuit pursuant to the Miller Act against Defendant concerning sums Plaintiff was owed under Phase II of the Courthouse project (hereinafter referred to as the Miller Act Litigation). Whitt Affidavit - Exhibit D.[1]

On December 12, 2000, Defendant pleaded guilty to fraud in connection with both Phase I and Phase II of the Courthouse project. Following Defendant's guilty plea in December, 2000,

---

[1] **T.J. Ahrens v. Morse Diesel Int'l, et. al.,** Case No. 4:00CV718DDN; later transferred to Senior United States District Judge Donald D. Alsop due to conflict of interest.

the government pursued the forfeiture of Defendant's consolidated claims in the Court of Federal Claims.

While Defendant and the GSA were arguing litigating the forfeiture of Defendant's consolidated claims, Plaintiff and Defendant entered into a Settlement Agreement and Mutual Release in 2002 (hereinafter "Release"). The meaning and effect of the Release is the subject of much disagreement between the parties. The language itself, however, is undisputed.

The subject of the Release, as stated in the document itself, is as follows:

> WHEREAS, a suit has been filed by Ahrens in United States District Court for the Eastern District of Missouri, Eastern Division, Cause No. 4:00CV718 (the "Lawsuit"), containing certain allegations against AMEC, the General Contractor on the Thomas F. Eagleton U.S. Courthouse Project (the "Project") . . . .
>
> WHEREAS, both Ahrens and Defendants desire to settle, conclude and completely resolve the Lawsuit and reach a full and final agreement on all issues, claims, and disputes between them pertaining to the Project.

Whitt Affidavit, Exhibit E; Defendant's Document [10], Exhibit 11.- Preamble. The meaning of the word "Project" as it is used in the Release is not further established or defined in the document itself. The Release required Defendant to pay Plaintiff $220,000, and in return Plaintiff would release Defendant from "any and all claims, demands, damages, costs, expenses, causes of action, debts, liabilities, covenants, or suits of any kind type, or nature whatsoever . . . arising from or pertaining to the Project, including but not limited to, all claims asserted or which could have been asserted by Ahrens in the Lawsuit." Plaintiff's Exhibit E, ¶1; Defendant's Exhibit 11, ¶1 . The Release further provides that the $220,000 payment "is in full settlement and payment for any and all claims related to the Project and, *save and except the claims associated or related to Phase I of the Project*, hereby assigns to AMEC any and all interest in such claims as it has not or may have hereafter . . . ." Plaintiff's Exhibit E, ¶2; Defendant's Exhibit 11, ¶2 (emphasis added).

The Release also contains a merger clause, which provides ". . . this Agreement constitutes the entire agreement and understandings of the parties regarding the settlement of the claims and disputes between them." Plaintiff's Exhibit E, ¶6; Defendant's Exhibit 11, ¶6. The Release further provides that "[t]here are no further or other agreements or understandings, written or oral, in effect between the parties relating to the subject matter hereof, unless expressly identified herein." Plaintiff's Exhibit E, ¶12; Defendant's Exhibit 11, ¶12. Finally, the Release states that it "shall be deemed to have been drafted jointly by the parties and will not be construed against either party." Plaintiff's Exhibit E, ¶11; Defendant's Exhibit 11, ¶11.

On January 26, 2007, the Court of Federal claims ruled that all of Defendant's consolidated claims, including Plaintiff's, totaling greater than $10,000,000 were forfeited pursuant to the Forfeiture of Fraudulent Claims Act as the result of Defendant's fraud conviction. On January 29, 2009, Defendant reached an settlement with the government whereby ACMI paid the government $11,710, 335.30 and released all claims arising out of the construction of the Courthouse, including Plaintiff's claims against the GSA.

Plaintiff contends that it was only after Defendant forfeited and released all of its claims against the GSA on or about January 29, 2009, that Defendant contacted Plaintiff concerning the status of Plaintiff's Phase I claims. Plaintiff filed the instant action alleging various breaches of the Standstill Agreement based upon the Defendant's alleged failure to timely apprise the Plaintiff of the various proceedings involving the Plaintiff's Phase I claims. Defendant contends that Plaintiff had full knowledge of the status of its Phase I claims, primarily due to the criminal prosecution of Defendant. Defendant further contends that the 2002 Release extinguishes **all** claims pertaining to both Phase I and Phase II of the Courthouse construction project, and thus, supercedes the Standstill Agreement.

**II.     Summary Judgment Standard**

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established a right to judgment with such clarity as to not give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977). Pursuant to Federal Rule of Civil Procedure 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467 (1962). The burden is on the moving party. City of Mt. Pleasant, Iowa v. Assoc. of Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the nonmoving party must do more that show there is some doubt as to the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for in its favor. Celotex v. Catrett, 477 U.S. 317, 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Under Missouri law, if the subject contract in a breach of contract action is ambiguous, a question of material fact exists as to the intent of the parties such that it is inappropriate for the Court to grant summary judgment. Lafrage North America, Inc. v. Discovery Grp., LLC, 574 F.3d 973, 979 (8th Cir. 2009). The threshold question of whether or not a contract is ambiguous, however, is a question of law which the Court may appropriately resolve through summary judgment. Monarch Fire Protection Dist. v. Freedom Consulting and Auditing Servs., 678 F.Supp. 2d 927, 935 (E.D. Mo. 2009).

In ruling on a motion for summary judgment, the Court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences

that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir. 1983). The Court is required to resolve all conflicts of evidence in favor of the non-moving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976). With these principles in mind, the Court turns to the discussion of the merits of Plaintiff's claims.

**III.     Discussion**

Of critical importance to the matter before the Court is the interpretation of the 2002 Release entered into between the parties. Defendant argues that the release unambiguously and unequivocally releases it from any liability to Plaintiff arising out of both Phase I and Phase II of the Courthouse project. Plaintiff argues to the contrary that the 2002 Release operates only as a release of its Phase II claims against the Defendant. Further, Plaintiff argues that the 2002 Release is ambiguous, and it is therefore inappropriate for the Court to grant Defendant's converted motion for summary judgment.

Where parties have expressed their complete agreement in an unambiguous writing, the intent of the contracting parties may be determined by the Court as a matter of law. *See* Deal v. Consumer Programs, Inc., 470 F.3d 1225, 1229 (8th Cir. 2006) (applying Missouri law). Discerning the intent of parties to an ambiguous contract, however, presents material questions of fact which render it inappropriate for the Court to resolve the matter through summary judgment. Lafrage North America, 574 F.3d at 979.

Under Missouri law, a contract is ambiguous if it is susceptible to more than one reasonable meaning such that reasonable persons may honestly and fairly differ in its interpretation. Weitz Co. v. Washington, 631 F.3d 510, 519 (8th Cir. 2011); Muilenburg, Inc. v. Cherokee Rose Design and Build, LLC, 250 S.W.3d 848, 854 (Mo. App. W.D. 2008). A contract is not considered ambiguous merely because the parties disagree as to its meaning. Mid

Rivers Mall, LLC v. McManmon, 37 S.W.3d 253, 256 (Mo. App. E.D. 2000). Missouri law recognizes two forms of ambiguity: patent and latent ambiguity. Royal Banks of Missouri v. Fridkin, 819 S.W.2d 359, 362 (Mo. banc. 1991). Patent ambiguity arises upon the face of the contract itself; while a latent ambiguity arises where a writing appears clear and unambiguous on its face, but some collateral matter makes its meaning uncertain. Id. Ambiguity may not be created by parol evidence. Lupo v. Shelter Mut. Ins. Co., 70 S.W.3d 16, 20 (Mo. App. E.D. 2002). However, "writings made a part of a contract by annexation or reference are to be considered in determining whether or not [the contract] is ambiguous." Lacey v. State Bd. of Registration for the Healing Arts, 131 S.W.3d 831, 839 (Mo. App. W.D. 2004).

Considering the language of the Release in its entirety, reasonable persons may honestly and fairly differ as to the meaning of the phrase "the Project" as it is used in the Release. "The Project" is defined in the first "Whereas clause" of the Release's preamble, which provides:

> WHEREAS, a suit has been filed by Ahrens in United States District Court for the Eastern District of Missouri, Eastern Division, Cause No. 4:00CV718 (the "Lawsuit"), containing certain allegations against AMEC, the General Contractor on the Thomas F. Eagleton U.S. Courthouse Project (the "Project") . . . .

Because "Project" follows "the Thomas F. Eagleton U.S. Courthouse Project" without qualification, a reasonable person could conclude that " Project" regards the construction of the Courthouse in its entirety. However, "Project," further appears to be defined in reference to the Miller Act lawsuit, designated by the parties as "the Lawsuit", among Plaintiff, Defendant, and various other co-defendants. Plaintiff's claims in the Lawsuit involved only Phase II of the Courthouse construction projects. Because "Project" is defined in the context of a lawsuit that only involved Phase II of the Courthouse construction projects, a different reasonable person could conclude that "Project" refers only to Phase II of the Courthouse construction. This interpretation is further reasonable in light of the second "Whereas clause" in the Preamble

which highlights the parties' desire to "settle, conclude, and completely resolve the Lawsuit . . .".

Defendant also argues that the Release's merger clause compels the interpretation that the Release applies to both Phase I and Phase II of the Courthouse construction. Paragraph 12 of the Release provides that the release is a "complete merger of all prior negotiation with respect to the *subject matter hereof*." Plaintiff's Exhibit E, ¶12; Defendant's Exhibit 11, ¶12 (emphasis added). The Release further provides that "there are no further or other agreements or understandings, written or oral, in effect between the parties relating to the *subject matter hereof*, unless expressly identified herein." Plaintiff's Exhibit E, ¶12; Defendant's Exhibit 11, ¶ 12 (emphasis added). In the absence of an express definition of "the subject matter hereof", reasonable persons could differ as to its meaning. A reasonable juror could interpret the subject language to include both phases of the Courthouse construction project. Similarly, a reasonable juror could conclude that the subject language refers only to the Lawsuit referenced in the Release's preamble, which concerned only claims related to Phase II of the Courthouse construction projects.

Defendant next argues that paragraph 2 of the Release, in which Plaintiff specifically reserves certain rights as they relate to Phase I of the Courthouse construction projects, clearly indicates that the 2002 Release included both Phase I and Phase II of the Courthouse construction. The Release provides that in exchange for a $220,000 payment in full settlement for "all claims relating to *the project*," Plaintiff assigned all interests in its claims to the defendants in the Lawsuit, "*save and except* the claims associated with Phase I." Given the nature of the relationship between Plaintiff and Defendant, a reasonable juror could find it significant that Plaintiff did not assign its Phase I claims to Defendant, and conversely that Defendant would give Plaintiff $220,000 in exchange for only a partial assignment of Plaintiff's

rights in light of the rest of the Release. Based on Plaintiff's express withholding of its right to payment on its claims involving Phase I of the Courthouse project, a reasonable juror could conclude that the Release itself was not intended to have any effect on any claims arising out of Phase I of the Courthouse construction projects.

For each of the reasons discussed above, reasonable jurors could differ as to the meaning of the 2002 Settlement Agreement and Mutual Release. Therefore, the Court finds the language of the Release to be ambiguous, especially as to its scope. Since the Release is ambiguous, the Court will not grant Defendant's motion for summary judgment. Accordingly, Defendant's motion for summary judgment will be denied.

In light of the Court's findings, the Court finds no need to further address the additional grounds for denial raised by the Plaintiff regarding the alleged breaches of the Standstill Agreement.

Dated this 31st day of January, 2012.

_____
UNITED STATES DISTRICT JUDGE